
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| MARIANNE MONTLER, an individual; | ) | |
| LIAM HOLBROOK, a minor, by and | ) | No. 39497-2-III |
| through his Guardian ad Litem, | ) | |
| MARIANNE MONTLER; and | ) | |
| MADELEINE HOLBROOK, a minor, by | ) | |
| and through her Guardian ad Litem, | ) | |
| MARIANNE MONTLER, | ) | UNPUBLISHED OPINION |
| | ) | |
| Respondents, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BELFOR USA GROUP, INC.; FIRST | ) | |
| AMERICAN PROPERTY & | ) | |
| CASUALTY INSURANCE CO.; | ) | |
| CHINOOK RESTORATION, INC., dba | ) | |
| PAUL DAVIS RESTORATION; | ) | |
| HARTFORD FIRE INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Appellants. | ) | |

STAAB, J. — Shortly after Marianne Montler purchased her home, she discovered

mold on the main floor and submitted a claim to her insurer, First American Property &

Casualty Insurance Co. (First American). First American denied the claim after

concluding that the damages pre-dated Montler's homeowner's "Policy." Approximately

two years later the upstairs bathroom overflowed (2017 flood). First American agreed

No. 39497-2-III
*Montler v. Belfor USA Group, Inc., et al.*

that damages caused by the 2017 flood were covered under the Policy. When repair work started, the contractor found mold damage on the home's main floor. First American took the position that the mold on the first floor was not caused by the 2017 flood and was not covered by the policy. After First American refused to participate in appraisal, citing disagreement on the cause and coverage of the mold damage, Montler sued, asserting several claims including breach of contract and breach of the Insurance Fair Conduct Act (IFCA), chapter 48.30 RCW.

Following an appraisal and a bench trial, the court entered a judgment primarily in First American's favor. The court found that Montler had proved breach of contract but failed to demonstrate any damages. The court denied attorney fees for both parties, but did impose CR 37 discovery sanctions against Montler and her attorney. On reconsideration, the court awarded Montler some of her attorney fees on her breach of contract claims.

First American appealed, and Montler cross-appealed. First American raises four issues on appeal and contends the superior court erred by: (i) finding it breached the policy, (ii) awarding Montler attorney fees pursuant to *Olympic Steamship Co. v. Centennial Insurance Co.*, 117 Wn.2d 37, 53, 811 P.2d 673 (1991), (iii) concluding First American failed to demonstrate material misrepresentation by Montler, and (iv) denying First American's motion for CR 11 sanctions.

2

Montler cross-appeals, raising three primary issues with several sub-issues, contending the superior court erred by: (i) determining the mold damage was not attributable to the 2017 flood based on a number of erroneous factual findings and failing to enforce the appraisal awards, (ii) failing to give proper effect to the pre-trial rulings of Judge Veljacic with respect to Montler's claims for breach of contract and breach of IFCA, and failing to award Montler any damages, and (iii) failing to award Montler all of her attorney fees. Montler further contends she is entitled to attorney fees on appeal.

We affirm the trial court's ruling with respect to the issues raised by Montler, deny or decline to address some of the issues raised by First American, but reverse the trial court's award of attorney fees to Montler under *Olympic Steamship*. Finally, we deny Montler's request for attorney fees on appeal.

BACKGROUND

A. DAMAGES TO MONTLER'S HOME

Marianne Montler purchased a home in Camas, Washington, and a homeowner's policy from First American with an effective date of June 17, 2015. At the time she purchased the home, there was evidence of past water damage and mold on the first floor.

Within weeks of purchasing the home, Montler became aware of mold in the downstairs bathroom of the home and submitted a claim to First American for water and mold damage. First American assigned American Leak Detection and American Environmental Group to inspect the bathroom. American Leak Detection inspected the

3

downstairs bathroom and reported that it had been improperly repaired or remodeled, and that the improper repair resulted in damage to the bathroom. American Leak Detection reported an elevated moisture level near the toilet, but found no moisture in the sub-flooring, no standing water in the crawl space, no mold growth, and no active plumbing leaks.

American Environmental Group also inspected the home's downstairs bathroom. Although the inspection found evidence of a prior water leak and water damage, American Environmental Group did not find any evidence of mold growth in the downstairs bathroom, which was the only room it inspected.[1] First American denied the 2015 claim as the damages pre-dated the Policy, noting that the previous tenants of the home had complained of mold in 2014 and there was no evidence the home was professionally remediated prior to Montler moving into the home in 2015.

Montler also contacted the prior owners of the home. The parties hired Mold Investigations, LLC, who conducted an inspection in July 2015 and identified past moisture intrusion and the presence of mold in air samples. It is not clear what work, if any, was done on the home after these inspections.

---

[1] American Environmental Group's report noted that it did not conduct intrusive sampling and that potential for mold growth in hidden areas such as behind walls and cabinets could not be discounted.

Two years later, "on October 17, 2017, the upstairs master bathroom toilet overflowed. The water flooded the bathroom floor and into the master bedroom," but "did not flow into the upstairs hallway or inside the master bedroom closet. Some of the water flowed through the ceiling to the entryway" on the main level of the home. Clerk's Papers (CP) at 2339.

Montler reported the 2017 flood to First American, who retained Josh Peters as its independent field adjuster. First American again hired American Leak Detection to investigate. American Leak Detection found high moisture readings on the engineered wood floor and in the coat closet on the main level, as well as in the master bedroom and bathroom where the toilet overflowed, but did not find elevated readings or anomalies in the living room ceilings or drywall. "First American also hired Belfor [USA Group, Inc. (Belfor)] to perform emergency remediation work," which included "removing all impacted sheetrock, insulation, cabinets, fixtures, flooring and carpet. Belfor then set up" and operated "drying equipment until its testing confirmed the impacted area was dry." CP at 2339.

Belfor provided the parties an estimate for repairing the home of $20,788.10. "On November 6, 2017, First American paid Montler for Belfor's remediation work." CP at 2339. Based on the Belfor estimate, First American issued payments to Montler and her home mortgage bank on November 13 for $18,684.79 to cover the estimated cost of repairs.

5

"On March 6, 2018, Montler retained Paul Davis [Restoration] to repair the home. First American and Montler agreed on the scope and cost of repairs." CP at 2340. "Davis discovered evidence of prior water damage and some possible mold near the kitchen and downstairs bathroom" after removing the living room flooring. CP at 2340. The bamboo flooring on the first floor had been installed by the prior owners. "Davis offered to clean the area and continue with the repairs," but "Montler refused." CP at 2340. Montler contacted First American to request a mold inspection and stated that she and her family needed to move into a hotel." CP at 2340. "First American agreed to pay for the hotel until it could determine the cause of the mold." CP at 2340.

In May 2018, American Leak Detection performed another inspection of the home. The May 2018 report indicated that repairs of the damage from the 2017 flood had uncovered prior damage. Specifically, the report noted, "[a] full inspection of the home's ground floor found multiple signs of previous water damage most likely from both upstairs bathrooms and kitchen," and "[t]he damage in the kitchen is from a previous leak near/at the kitchen sink area. No leak is present now." CP at 963-64.

"First American retained Nancy Lee [ ], a Certified Industrial Hygienist for Rimkus Consulting Group, to determine the location and source of the water and mold spores. Ms. Lee inspected the home on May 18, 2018." CP at 2340. Her report, dated June 6, (hygienist report) "indicated that the total airborne concentration of fungal spores [in the home] was at least 1.6 times higher outdoors than indoors" and that "indoor levels

6

of [certain types of] fungal spores were above outdoor levels at the time of sampling." Ex. 150 at 5. She concluded that these results suggested "the presence of active and/or historical fungal growth within the residence likely related to the mold growth observed within the walls of bathroom 1 as well as throughout the first-floor underlayment." Ex. 150 at 5. Lee reported "multiple areas of prior water intrusion and evidence of inactive mold growth." CP at 2340. She concluded there were four possible moisture/water sources: one being the 2017 flood and the other three sources pre-dating the effective date of the policy. She also identified six areas in the home with indicators of water and/or mold damage. Only one of the six observations of water and/or mold identify the 2017 flood as the source of damage, with three moisture sources pertaining to the dining room and family room attributed, designated as unknown.

On May 22, "Montler retained Adam Blagg as her appraiser" and he "developed an estimate of costs to repair the home and an estimate to remediate/replace the contents." CP at 2341. He valued the "property damage to the Home at $187,247.79 and the damage to the contents of the Home at $138,753.10 for replacement cost value and $118,552.91 as actual cash value." CP at 2341. He estimated $31,557.62 in repairs to the upper level, and $110,628.38 to the main level. Although Blagg's estimate did not indicate a cause of the damages, the court found that he "should have known through his inspection of the Home and its contents that his appraisals included damages to the Home and contents that were not attributable to the [2017 flood]." CP at 2341.

Montler also retained Jason Kester of Mold Investigations, LLC, who conducted a mold inspection of the home on June 9. Kester reported the presence of microbial growth, water damage, and water stains in the kitchen, dining room, and living room, and reported the presence of various fungal strains in each room. Kester's report "did not address causation of the mold he found in the Home." CP 2340, 2761.

In June 2018, Montler contacted First American and demanded an appraisal of the 2017 flood and submitted the Blagg estimate. The various representatives from both parties continued to meet and communicate, but were unable to agree on the cause of the additional mold damage found on the first floor. Ultimately, First American refused to name an appraiser because it disputed the cause and coverage of the mold damage.

B. PRE-TRIAL PROCEEDINGS

In July 2018 Montler filed a lawsuit against First American and other parties who are not the subject of this appeal. As to First American, she asserted claims for violation of the Consumer Protection Act (CPA), ch. 19.86 RCW, Breach of Contract, Violation of the Insurance Fair Conduct Act (IFCA), RCW 48.30.010-.015, and declaratory relief in the form of an order requiring First American to submit to appraisal. First American's Answer asserted a number of affirmative defenses, including: (i) the "claimed damages or losses were in whole or in part the result of the conduct of plaintiffs," and (ii) any claims are "subject to the limits of liability, and all of the terms, conditions, exclusions and limitations of the Policy, as it was in effect at the time of this loss." CP at 29.

One of the other defendants, Belfor, unsuccessfully moved to consolidate the matter with another action filed by Montler in Clark County superior court, *Montler et al. v. Julie Yang, et al.*, No. 18-2-05333-5. The Yangs were the previous owners of the home, and Montler filed an action against them in May 2018 for fraudulent concealment, violations of the CPA, and negligence, and claimed damages associated with mold exposure in the home. Montler asked the court to deny the motion to consolidate as moot because the *Yang* case had been settled, and settlement documents were in the process of being finalized. The court apparently denied the motion.

On February 20, 2019, Montler filed a motion to compel First American to submit to mandatory appraisal, to appoint an umpire, and for partial summary judgment. Montler asserted that she had made a timely demand for appraisal under the policy but First America refused to proceed even though submission was mandatory under the policy's appraisal provision. Montler also asked for a partial summary judgment order that she was entitled to continued loss of use benefits until the house was repaired and fit to live in.

First American claimed appraisal was premature where the parties disputed whether all the claimed damages were caused by the 2017 flood, and the question of causation and coverage was outside the scope of appraisal. First American noted that the *Yang* litigation raised the same factual questions relevant in this lawsuit, namely the

9

cause and extent of the mold in the home, the date it began, and what attempts at remediation had been made.

In Montler's reply brief, she asserted that her claims in the *Yang* lawsuit were for personal injury from undisclosed mold at the time of the sale, and had nothing to do with the mold in the home caused by the 2017 flood.

Judge Veljacic[2] heard the motion to compel appraisal on June 7, 2019. First American acknowledged that it accepted coverage subject to exclusions, including damage by other parties and damage that predated the policy. It disagreed that an appraisal could resolve issues of causation, coverage, and allocation of fault. Ultimately, Judge Veljacic ruled the parties should submit to an appraisal and named retired Judge Roger Bennett as the umpire. With respect to Montler's motion to continue loss of use benefits, Judge Veljacic held:

> So I'm going to order the benefits continue because there appears to be, at this point, a material breach with regard to the appraisal provision. And I can't in good conscience let the—what appears to be dilatory behavior on the part of [First American] then benefit [First American] in terms of being able to cut off benefits to Ms. Montler. I don't—that would be unconscionable.

Rep. of Proc. (RP) at 39-40.

---

[2] Judge Veljacic was the Clark County Superior Court judge originally assigned to this case. He was appointed to Division Two of this court prior to trial. Many of Montler's claims assert that the trial judge did not give proper deference or effect to Judge Veljacic's prior rulings, and therefore we distinguish between those rulings made by Judge Veljacic and those made by Judge Sheldrick.

Judge Bennett submitted two agreed appraisal awards. One appraisal provided a damage amount for the mold appraisal and the other provided a damage amount of the water damage. Both appraisal awards state, "The Appraisers have reached agreement of the property value. The Appraisal does not address policy coverage, policy limits, prior payments by Insurer, and all terms and conditions of the insurance policy remain in force." CP at 333-34.

Montler moved to confirm the appraisal award. She argued that First American was required to pay the full appraisal award within 30 days of its entry pursuant to the "Loss Payment" provision in the Policy. First American objected.

At a hearing on Montler's motion to confirm the appraisal Montler's attorney, Vance, acknowledged that the appraisal awards "say that they don't deal with coverage or policy limits or these other things." RP at 52. With this limitation in mind, the court instructed the parties to prepare a stipulated order. Despite their agreement at the hearing, the parties were apparently unable to agree to a stipulated order.[3]

Montler subsequently filed a motion for partial summary judgment, asking the court to: (i) hold that First American breached the Policy and the IFCA by refusing to submit to appraisal and failing to pay the full appraisal awards within 30 days of entry of

---

[3] The record indicates that First American wished to include a provision that confirmation of the awards did not trigger the 30-day loss payment provision, and Montler refused to agree to the addition of that language.

the agreed awards, (ii) confirm the appraisal awards and award prejudgment interest

commencing 31 days after they were filed, and (iii) issue partial summary judgment that

Montler's claims are covered under the Policy.

When Judge Veljacic addressed Montler's motion for partial summary judgment

and an order confirming the appraisal awards, he stated:

> And so I believe I'm on firm ground in confirming that those are the values.
> So that document speaks for itself. I'm confirming it today. I'll entertain
> an order to that effect. I will not speak as to the legal effect of this
> confirmation. I understand that to be in dispute. So—and I don't know that
> I'm required to speak to the legal effect of that at this point. That's simply
> what's required by the contract.

RP at 78. He denied First American's motion to enter its proposed order. Judge Veljacic

subsequently entered an order on June 3 denying Montler's summary judgment motion as

well as a motion for partial summary judgment filed by First American.

First American moved for leave to amend its answer to the amended complaint to

add an affirmative defense of misrepresentation and concealment. First American

asserted it had recently discovered that Montler represented to the former owner of the

house (the Yangs) that the mold damage identified by Kester was present in 2015 when

she purchased the house. First American filed a declaration from Steven Turner, the

attorney for the Yangs, stating that: (i) "[a]mong the damages sought by plaintiff

Marianne Montler [in that case] was the cost to remediate and repair mold damage Ms.

Montler alleged was present in 2015" when she purchased the property, and (ii) the

12

No. 39497-2-III
*Montler v. Belfor USA Group, Inc., et al.*

Montlers submitted two key documents with a September 2018 settlement demand letter in the *Yang* matter: the June 2018 Blagg estimate for $153,898.66 in repair costs and the May 2018 Kester report.  CP at 1904.  First American also filed a copy of the demand letter, which detailed the various health symptoms Montler and her children experienced after moving into the home in 2015.  The letter offered to settle the case for $185,000.00 total, and noted:

> It should not be lost on the Yangs that this settlement offer does not include the cost of repairs, hotel expenses or reimbursement for contaminated personal property, which is also inching upwards into the six figures.  This reduction is for this offer only and only if accepted in full. ***We have an appraiser evaluating the contents claim now.  But make no mistake, the Yangs are responsible for these damages, even the ones not mentioned in this offer . . .***
> For the purpose of this offer only, my clients will seek repair costs and contents reimbursement from their insurer, but this is no guarantee that the insurer will not seek to pursue subrogation rights against the Yangs, once it pays off.  The Yangs assume that risk….  And if this settlement offer is rejected, ***we will pursue cost of repair and contents and hotel expenses from the Defendants in this case, as well as potential additional damages for toxic exposure.***

CP at 1812 (emphasis added).

First American noted that Montler's discovery responses repeatedly asserted that the damages sought in the *Yang* matter were separate and distinct from the damages sought in this matter, and she failed to produce the 2018 settlement letter in response to First American's discovery request for documents related to her claim for property

13

damage in the *Yang* matter. The court granted the motion to amend over Montler's objection.

C. TRIAL

A four-day bench trial occurred before Judge Sheldrick starting in August 2021. Montler testified that she knew there was an issue with the home in 2015 shortly after moving in because her children started experiencing medical issues, that she had an environmental assessment done after the 2015 repairs were completed, and her family was able to live in the home from 2015 until 2017 without further health issues. She testified that she believed Mold Investigations, LLC found mold in the air, and so she paid for PuroClean to remediate the air. With respect to the *Yang* litigation, she testified that her case against the Yangs sought damages related to medical expenses and the cost to remediate the property in 2015. She also stated that her settlement demand letter to the Yangs was not a claim for the damages sought in this case but instead a communication that the Yangs potentially risked a bigger lawsuit from the insurance company.

Blagg testified that he had experience as a certified mold inspector and a public adjuster but was hired only as an appraiser in this matter. With respect to the damage, he testified that it was easy for him to track water staining from the upstairs to where it ran down the walls, ceiling and traveled downstairs through capillary action, which caused the spread of the water to the main level. He also testified that American Leak Detection's 2015 report finding no mold and First American's 2015 letter denying

coverage operated as an admission from First American that the water damage and mold were not prior conditions. Blagg acknowledged that his opinion of the cause of the mold differed from the 2018 American Leak Detection Report, the Hygienist report, and Josh Peters.

Kester testified that he observed signs of water damage and mold in the kitchen and underneath the dining room and living room as well as around the upstairs toilet, and that he found various mycotoxins present in the home. He testified that he found multiple types of mold, and that at least two of the types he found required the area to be actively wet to grow, indicating an active moisture source. However, he also acknowledged that he did not find any areas of elevated moisture in the house and there was not sufficient moisture content for mold to grow at the time of his inspection. He acknowledged that he previously inspected the home in 2015 and that he remembered mold being present at that inspection, but stated he did not put anything about the prior mold damage in his report because it was not relevant as he was not there to determine causation but instead merely there to determine what was actively going on. He also testified that he was not able to determine whether the water from upstairs tracked down through the walls, that the water tracking determination was "Mr. Blagg's part," but that he agreed with Blagg's assessment and determinations. When asked directly whether his report specifically attributed the mold found at the Montler house to the October 2017 event, he stated it did not.

15

First American presented testimony from Steven Turner, the attorney who represented the defendants in the *Yang* litigation, as well as Joshua Peters, Nancy Lee, and Roger Howson. Peters, First American's adjuster, testified in part that he did not observe the type of damage to the ceiling and walls that he would have expected to see if Blagg's theory that the October 2017 event caused all the damage was correct.

Lee's testimony was generally consistent with the Hygienist report she prepared. She testified that she was hired "to determine the cause and origin of the moisture intrusion and to determine the presence of the fungal growth and recommendations." RP at 991. She testified in part that: (i) the home had sustained damage from numerous sources of water intrusion, (ii) although some of the moisture sources were undetermined, there was documentation of other water sources and remediation from 2014 and 2015 of the kitchen and downstairs bathroom, and (iii) although several moisture sources on the main floor were undetermined, she did not believe they were caused by the October 2017 event. She did not detect elevated moisture in the home but did identify visible fungal growth on numerous locations of the main floor underlayment. She also testified that it was "possible for mold to become dormant after being covered" in flooring, and that in this instance, it was "possible that the mold becomes sealed and undetectable" once the bamboo flooring was placed over it by the prior owners, and that removal of the bamboo flooring in 2018 caused mold spores to be released into the air. RP at 1014-15. Contrary to Blagg, she testified that she observed different water trails throughout the house but

16

not one specific line. She also testified that nothing in the home made her concerned about the health, safety, or livability of the home due to mold.

With respect to the appraisal process, First American's appraiser, Roger Howson, testified that the appraisal panel does not address causation or whether something is covered and that if causation is in dispute at the time of appraisal, the disputed amount would be included in the appraisal award. He also testified that the panel in this instance did not address causation but reserved that issue for the court. He noted that it was important to bring the Hygienist report to Judge Bennett's attention because he wanted it to be clear to him as the appraisal umpire that the panel was just determining loss damage, i.e., determining what it would cost to put the home in the same condition pre-loss, but that they were not confining themselves to saying the damage was from one occurrence. He further testified that even when causation is in dispute, the parties can still go to appraisal because the appraisers are just determining loss damage evaluation, and that in such instances, the causations dispute is either resolved at the front end by the court setting the scope of appraisal or it gets resolved at the back end where the court interprets the law and applies the policy to the appraisal award.

On August 30, 2021, the superior court entered findings of fact, conclusions of law and order. Relevant to the appeal here, the court found that:

> 21. On June 9, 2018, Jason Kester of Mold Investigations, LLC conducted a mold inspection of the Home. Mr. Kester did not address causation of the mold he found in the Home.

17

22. By a preponderance of the evidence, the Court finds that the mold located in the Home is not attributable to the October 17, 2017 water loss event.

. . . .

26. As an appraiser, Blagg did not make a conclusion as to causation for the mold and water damage to the Home or its contents. However, Blagg should have known through his inspection of the Home and its contents that his appraisals included damages to the Home and contents that were not attributable to the water loss event.

. . . .

29. By a preponderance of the evidence, Montler knew Adam Blagg's estimates for his appraisal to repair the Home and replace/remediate its contents were used to leverage potential settlement in her claims against the prior owners.

30. By a preponderance of the evidence, Montler knew that Jason Kester's mold investigation report was used to leverage potential settlement in her claims against the owners.

31. By a preponderance of the evidence, Montler knew or should have known that Adam Blagg's appraisal of the Home and contents included damages that were potentially attributable to water damage that pre-dated Montler's purchase of the Home.

32. On September 9, 2019, the parties submitted an Agreed Appraisal of Loss ("Appraisal") (Ex. 162). The Appraisal did not assign causation but did bifurcate the appraisal award as follows: "Mold Appraisal Award" and Water Damage[sic] Appraisal Award."

33. The Court finds by a preponderance of the evidence that the Mold Appraisal Award is not attributable to the water loss event.

18

34. The Court finds by a preponderance of the evidence that the Water Damage Appraisal Award is attributable to the water loss event.

35. First American paid Montler in excess of the Water Damage Appraisal Award.

CP at 2341-42.

The court concluded that First American's delay in appointing an appraiser did not violate the IFCA but did breach the parties' policy. Nevertheless, the court found that the delay did not cause Montler any damages because ultimately the mold damage was not covered by the policy with First American. The court concluded that "First American did not breach the policy by refusing to compensate Montler for the damages associated with the Mold Appraisal Award." CP at 2343. "Since First American is not liable for the 'Mold Appraisal Award' and has fully compensated Montler for the 'Water Loss Damage Award,' First American is no longer responsible for continuation of Loss of Use" benefits. CP at 2343.

The court also concluded that First American failed to satisfy its burden to demonstrate "Montler intentionally or materially misrepresented or concealed material information in her insurance claim for the water loss event to First American." CP at 2344. The court accordingly granted Montler's claim for breach of contract for failure to submit to appraisal, denied Montler's remaining claims, denied First American's affirmative defense of misrepresentation and denied both parties demands for damages, ordering that any requests for attorney fees or costs be submitted pursuant to CR 54(d).

19

D.  POST-TRIAL PROCEEDINGS

On September 10, 2021, Montler filed a petition for attorney fees.  Despite Judge Sheldrick's conclusions, Montler argued that Judge Veljacic had previously held that First American had breached the policy and the IFCA, and Montler was entitled to her attorney fees.  She also sought fees under *Olympic Steamship*[4] for having to bring a lawsuit and move to compel appraisal and the continuation of her loss of use benefits.

First American filed a motion for CR 11 sanctions, seeking fees in the amount of $193,577.50.  First American argued that Montler, Blagg, and Montler's counsel, Vance, made repeated misrepresentations to the court where: (i) they repeatedly asserted that Kester determined the mold damage identified in his report was caused by the 2017 flood even though he testified that he never drew a causal connection between the mold and the October 2017 event, (ii) they used the same Kester report and Blagg estimate to leverage a settlement from the *Yang* defendants despite repeatedly claiming the *Yang* litigation did not concern the same damages as those claimed in the present action, and (iii) in discovery they responded that the *Yang* lawsuit merely sought reimbursement for what Montler spent in 2015 to remove the mold and did not allege a need for future repairs, in contradiction of the *Yang* demand letter.

---

[4] *Olympic S.S. Co. v. Centennial Ins. Co.*, 117 Wn.2d 37, 53, 811 P.2d 673 (1991).

In her response to the CR 11 motion, Montler included a motion to stay termination of loss of use benefits, claiming the court decided to do what Judge Veljacic previously described as "unconscionable," and tried to "negate the decisions of two long time and respected judges with the mere stroke of a pen." CP at 2435. She also asserted a number of arguments challenging the court's findings and conclusions.

The court considered all three motions together. With respect to the CR 11 motion, the court noted there had been problematic conduct on the part of Montler's attorney, especially with respect to his assertions regarding the scope of the issues before the court at trial and representations as to Judge Veljacic's earlier rulings. The court later entered an order denying all three motions. The court found Montler was not entitled to attorney fees because she failed to demonstrate a violation of IFCA and "she did not substantially prevail in her claim for breach of contract," and that she was "not entitled to continuation of her Loss of Use Benefits since this Court found that [First American had] fully compensated [Montler] for her claim." CP at 2524. The court denied the CR 11 motion, but requested briefing to evaluate potential CR 37 sanctions. The court subsequently found that Montler violated CR 37 and imposed a sanction of $2,500.00 against Montler and her attorney.

Montler filed a motion for new trial, reconsideration and to amend the judgment. After a hearing on this motion, the court entered an order on reconsideration along with amended findings of fact, conclusions of law and judgment. The court amended finding

21

of fact 21 to include that: "'On June 9, 2018, Jason Kester of Mold Investigations, LLC conducted a mold inspection of the Home.  Mr. Kester's Report (Exhibit 5) did not address causation of the mold he found in the Home.'"  CP at 2761.

The court also entered supplemental findings of fact and conclusions of law.  The court found that First American did not submit to appraisal because it disputed causation and Montler received loss of use benefits after the court ordered the benefits to continue.  The court concluded that confirmation of the appraisal was subject to a determination of causation.  First American did not delay the appraisal in violation of the IFCA and thus, Montler was not entitled to attorney fees under RCW 48.30.015.  "Since the Court found that First American has fully compensated [Montler] for the [damages]" coverage by her policy, "First American was not obligated to continue paying Loss of Use" benefits.  CP at 2762.  However, the court concluded that Montler was entitled to attorney fees in the amount of $18,771.00 under *Olympic Steamship* for bringing the motion to compel appraisal.  "The Court denies all other requests by Montler for a new trial, reconsideration or amendment of judgment."  CP at 2763.

Both parties appealed to Division Two of the Court of Appeals.  Division Two subsequently transferred the case to this court.

22

ANALYSIS:

Collectively, the parties raise seven issues on appeal with several sub-issues. For purposes of clarity, we consolidate and rearrange the issues. We affirm the trial court in all respects save for the award of fees to Montler, which we reverse.

A. STANDARD OF REVIEW:

"[F]ollowing a bench trial, appellate review is limited to determining whether substantial evidence supports the findings of fact and, if so, whether the findings support the conclusions of law." *State v. Homan*, 181 Wn.2d 102, 105-06, 330 P.3d 182 (2014). Evidence is substantial if it is "sufficient to persuade a fair-minded person of the truth of the asserted premise." *Id.* at 106. Substantial evidence review requires the court to view the evidence and all reasonable inferences in the light most favorable to the prevailing party. *Korst v. McMahon*, 136 Wn. App. 202, 206, 148 P.3d 1081 (2006). This court defers to the trial court's advantage in viewing the proceedings and does not reweigh evidence or determine the credibility of witnesses. *In the Matter of A.W.*, 182 Wn.2d 689, 711, 344 P.3d 1186 (2015). Unchallenged findings of facts, along with findings of fact supported by substantial evidence, are verities on appeal. *Homan*, 181 Wn.2d at 106. This court reviews conclusions of law de novo. *Id.*

B. MONTLER'S CHALLENGE TO THE TRIAL COURT'S FINDING THAT THE MOLD DAMAGE WAS NOT ATTRIBUTABLE TO THE 2017 FLOOD

In Montler's first issue on cross-appeal, she contends that the trial court's finding, that the mold found in the home during the spring of 2018 was not attributable to the 2017 flood, was not supported by substantial evidence. More specifically, she contends that (i) neither causation nor coverage were in dispute and the court mischaracterized the testimony of Montler's witnesses, (ii) the trial court incorrectly found that the appraisal panel did not address causation, and (iii) the court erred by failing to apply the "Efficient Proximate Cause Rule." Each of these arguments fails.

Contrary to Montler's argument, First American has disputed causation for the mold damage since it was first discovered. In June 2018, First American's adjuster, Peters, and Jason Beaudoin from Belfor met with Montler's appraiser, Blagg to inspect the damage. Peters and Beaudoin disagreed with Blagg's conclusion that all the damage identified in his estimate was caused by the 2017 flood. In response to the motion to compel appraisal, First American expressly argued that appraisal was premature under the Policy because there was a causation dispute, noting that there was damage that pre-dated the Policy and that Montler had filed an action against the *Yangs* that presumedly related to that damage. At the hearing on the motion to compel appraisal, First American noted that the appraisal award should not trigger the Policy obligation to pay the full

awards within 30 days because there were still issues regarding whether all claimed damages were a covered loss.

The trial court found that the "mold located in the Home is not attributable to the October 17, 2017 water loss event." Montler contends that the trial court incorrectly portrayed the testimony of her witnesses Kester and Blagg as not reaching a conclusion on the cause of the mold damage. The court's findings relate to the reports submitted by Kester and Blagg, not necessarily their trial testimony. When asked at trial, Kester expressly stated that his report did not attribute the mold found at the home to the October 2017 event. Likewise, Blagg's 2018 report did not indicate the cause of the mold damage found on the first floor. The court's characterizations of these reports was supported by substantial evidence.

In challenging the court's finding that the mold damage was not caused by the 2017 flood, Montler focuses on the testimony of her own witnesses at trial. However, the testimony of Kester and Blagg was contradicted by the 2018 American Leak Detection report, as well as the testimony of Peters, First American's claims adjuster, and Nancy Lee, the certified industrial hygienist.[5] Both the 2018 American Leak Detection report and Lee's Hygienist report agreed that the majority of the mold damage was not caused by the 2017 flood, and Lee testified that the home had sustained damage from numerous

---

[5] In her brief, Montler asserts that Kester is an industrial hygienist, but Kester testified that he not an industrial hygienist, but rather an environmental professional.

sources of water intrusion and that she believed the majority of the moisture sources on the main floor were not caused by the October 2017 event. Peters testified that he did not observe the type of damage to the ceiling and walls that he would have expected to see if Blagg's theory that the 2017 flood caused all the damage was correct. On appeal, Montler does not acknowledge the testimony of Lee.

The evidence was sufficient to support the trial court's finding that the mold was not caused by the 2017 flood. We defer to the trier of fact on issues of witness credibility, conflicting testimony, and the persuasiveness of the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). "Credibility determinations cannot be reviewed on appeal," as they "are solely for the trier of fact." *Morse v. Antonellis*, 149 Wn.2d 572, 574, 70 P.3d 125 (2003).

Next, Montler challenges the trial court's conclusion that the appraisal report did not establish causation. While both the mold and water appraisal reports indicated that the date of loss is the date the toilet overflowed, October 17, 2017, the reports also make clear that they are not deciding issues of coverage. The appraisal umpire, retired Judge Bennett, made it clear to both appraisers that the appraisal reports did not decide when the damage occurred or issues of causation. Instead, Judge Bennett noted, "My belief is that we are presented with a damaged house, and the court and parties need to know how much it will cost to fix it. Then, if they choose to do so, they get to fight about how much

of that cost is attributable to different events." CP at 786. The trial court's finding that the appraisal did not decide causation is supported by substantial evidence.

Montler also contends the trial court failed to apply the efficient proximate cause rule. Under Washington law, the rule of efficient proximate cause provides coverage "'where a covered peril sets in motion a causal chain[,] the last link of which is an uncovered peril.'" *Xia v. ProBuilders Specialty Ins. Co.*, 188 Wn.2d 171, 182-83, 400 P.3d 1234 (2017), (alteration in original) (quoting *Key Tronic Corp. v. Aetna (CIGNA) Fire Underwriters Ins. Co.*, 124 Wn.2d 618, 625, 881 P.2d 201 (1994)). "If the initial event . . . is a covered peril, then there is coverage under the policy regardless [of] whether *subsequent events within the chain*, which may be causes-in-fact of the loss, are excluded by the policy." *Safeco Ins. Co. of Am. v. Hirschmann*, 112 Wn.2d 621, 628, 773 P.2d 413 (1989) (emphasis added).

Montler contends that the toilet overflow was a covered event and thus, any damages proximately caused by this event were covered by the policy. The trial court found otherwise: that the toilet overflow was not the cause of mold damage. Consequently, the court did not error in failing to apply the efficient proximate cause rule.

C. MONTLER'S CLAIM THAT THE TRIAL COURT'S FINDINGS AND CONCLUSIONS CONFLICTED WITH THOSE MADE BY JUDGE VELJACIC

In her second issue on appeal, Montler contends that Judge Sheldrick erroneously failed to enforce the appraisal award previously confirmed by Judge Veljacic and failed to respect Judge Veljacic's prior decisions on disputed issues. Additionally, Montler contends that Judge Sheldrick's conclusions, that First American promptly investigated the water loss damage and did not delay the appraisal in violation of the policy and the IFCA, were not supported by substantial evidence. Montler's arguments are not supported by the law or the record.

Montler contends that Judge Sheldrick was required to respect the appraisal award and Judge Veljacic's confirmation of that award, and was required to award Montler the full amount of the mold appraisal and the water appraisal unless First American proved bias or prejudice in the appraisal process. We disagree.

The appraisal panel bifurcated the appraisal award into two awards, one for water damage and one for mold damage. Judge Veljacic did not decide causation and coverage when he entered a limited confirmation of the appraisal awards. Although Judge Veljacic confirmed the valuation of all the identified damage, he clearly indicated he was not deciding the legal effect of the confirmation as there were still issues in dispute. Judge Sheldrick found that the appraisal awards did not decide issues of causation or coverage and, as we noted above, this finding is supported by substantial evidence. Regardless of

whether it was legally correct for the appraisers to decide causation, they did not in fact decide this issue.

Judge Sheldrick was not required to enforce the appraisal awards when disputed issues of causation and coverage remained undecided. Under Washington law, appraisal provisions are "universally held to be valid and enforceable." *Goldstein v. Nat'l Fire Ins. Co. of Hartford, Conn.*, 106 Wash. 346, 353, 180 P. 409 (1919). Our courts have recognized that appraisal provisions are justified in the expectation that they will "provide a plain, inexpensive and speedy determination of the extent of the loss." *Keesling v. W. Fire Ins. Co. of Fort Scott, Kansas*, 10 Wn. App. 841, 845, 520 P.2d 622 (1974). The general rule is that appraisal awards made pursuant to an insurance policy are binding and conclusive as to the amount of loss, absent proof by the challenging party of bias or prejudice in the appraisal process. *See, e.g., Bainter v. United Pac. Ins. Co.*, 50 Wn. App. 242, 245-48, 748 P.2d 260 (1988).

However, an appraisal provision is "not self-executing; and, if the company does not pay the damages fixed by the appraisers, an insured must commence legal action, the appraisal must be confirmed by the court and judgment entered for the insured." *Keesling v. W. Fire Ins. Co. of Fort Scott, Kansas*, 10 Wn. App. 841, 845, 520 P.2d 622 (1974). "The authority and control over the ultimate disposition of the subject matter remains with the courts." *Id.* Here, Judge Sheldrick correctly decided that unresolved issues of

causation and coverage needed to be decided before the appraisal award could be enforced.

Montler also contends that Judge Veljacic made final decisions on disputed issues, including that First American was dilatory in participating in appraisal and this delay was a breach of the policy and IFCA. Although Judge Veljacic made comments about First American's delay and the appearance of a breach, his comments were not reduced to an order and do not constitute a final decision on these issues. Indeed, after being appointed to Division Two of this court, Judge Veljacic recognized the distinction between a comment on the record and a final decision reduced to an order when he wrote:

> Washington is a written order state. *State v. Molina*, 16 Wn. App. 2d 908, 922, 485 P.3d 963, *review denied*, 198 Wn.2d 1008 (2021). The written order is controlling and the trial court's oral statements are no more than a verbal expression of its informal opinion at the time.

*Landes v. Cuzdey*, No. 56419-0-II, slip op. at 17 (Wash. Ct. App. May 16, 2023) (unpublished), https://courts.wa.gov/opinion/pdf/D2%2056419-0-II%20Unpublished %20Opinion.pdf. Montler fails to cite any written order signed by Judge Veljacic that memorializes his verbal comments.

Montler also challenges Judge Sheldrick's conclusions of law that Montler failed to demonstrate that First American's delay in seeking an appraisal violated the policy and the IFCA. Her argument, that these conclusions are not supported by substantial evidence, mis-states the applicable standard of review. Conclusions of law are reviewed

on appeal to determine if they correctly apply the law and are supported by the finding of fact. *Homan*, 181 Wn.2d at 105-06.

The IFCA gives insureds a cause of action against insurers who "unreasonably denied a claim for coverage or payment of benefits." RCW 48.30.015(1). IFCA also directs courts to award triple damages and attorney fees if the insurer either acts unreasonably or violates certain insurance regulations, including those set forth in WAC 284-30-330.

The regulations referenced in RCW 48.30.015(5) "broadly address unfair practices in insurance, not just unreasonable denials of coverage or benefits." *Perez-Crisantos v. State Farm Fire & Cas. Co.*, 187 Wn.2d 669, 672, 389 P.3d 476 (2017). WAC 284-30-330, which defines "[s]pecific unfair claims settlement practices," provides in part that an insurer engages in unfair methods of competition and unfair or deceptive acts or practices in the context of claims settlement by:

> (7) Compelling a first party claimant to initiate or submit to litigation, arbitration, or appraisal to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in such actions or proceedings.
> . . . .
> (17) Delaying appraisals or adding to their cost under insurance policy appraisal provisions through the use of appraisers from outside of the loss area.

WAC 284-30-330.

31

While the regulations define unfair practices, they do not create an independent cause of action under the IFCA. *Perez-Crisantos*, 187 Wn.2d at 676-84. Instead, to prevail on a claim under the IFCA, the insured must demonstrate that "'the insurer unreasonably denied a claim for coverage or that the insurer unreasonably denied payment of benefits. If either or both acts are established, a claim exists under IFCA.'" *Id.* at 683 (quoting *Ainsworth v. Progressive Cas. Ins. Co.*, 180 Wn. App. 52, 79, 322 P.3d 6 (2014)); *see also W. Beach Condo. v. Commonwealth Ins. Co. of Am.*, 11 Wn. App. 2d 791, 805, 455 P.3d 1193 (2020). The regulations identified in WAC 284-30-330 only support imposition of triple damages and attorney fees if the insured demonstrates a violation under RCW 48.30.015(5).

Here, the trial court's findings support its conclusions that First American's delay did not violate the IFCA. The court found that First American promptly investigated and paid for the water damage to the home caused by the 2017 flood. The court also found that the mold damage was not caused by the 2017 flood. The court found that First American did not submit to appraisal because it disputed the cause of the mold damage. These findings support the court's conclusion that the delay in identifying an appraiser did not violate the IFCA.

D. WHETHER FIRST AMERICAN BREACHED THE INSURANCE POLICY BY FAILING TO NAME AN APPRAISER

In its first issues on appeal, First American claims that the trial court erred in concluding that it breached the parties' insurance policy by refusing to participate in appraisal. First American contends that this conclusion was erroneous for two reasons. First, First American argues that the policy provision requiring an appraiser to determine the "amount of loss" does not encompass a finding on the causation of the loss or whether the loss was covered by the policy. Since causation and coverage were disputed, and these issues need to be determined by the court, First American argues it cannot be in breach for failing to participate in the appraisal. Second, First American argues that the conclusion of breach was error as a matter of law because the trial court did not find the breach caused Montler any damages and damages are necessary element to any claim of breach of contract.

We agree with First American's second argument, and hold that Montler failed to prove breach because she failed to prove damages. Because we find no breach of the policy, we decline to address First American's first claim on whether an appraisal provision in an insurance contract decides contested issues of causation and coverage.

In Washington, "[c]ontract damages are ordinarily based on the injured party's expectation interest and are intended to give the injured party the benefit of its bargain." *Panorama Vill. Homeowners Ass'n v. Golden Rule Roofing, Inc.*, 102 Wn. App. 422, 427,

10 P.3d 417 (2000) (citing *Eastlake Const. Co. v. Hess*, 102 Wn.2d 30, 46, 686 P.2d 465 (1984)).  A breach of contract is actionable if the contract "imposes a duty, the duty is breached, and the breach was a proximate cause of damage to the claimant." *Nw. Indep. Forest Mfrs. v. Dep't of Lab. & Indus.*, 78 Wn. App. 707, 712, 899 P.2d 6 (1995).  However, in a contract action for damages only, a failure to prove damages warrants dismissal.  *Ketchum v. Albertson Bulb Gardens*, 142 Wash. 134, 139, 252 P. 523 (1927) (mere proof of contract breach, without more, does not warrant verdict even for nominal damages), *Jacob's Meadow Owners Ass'n v. Plateau 44 II, LLC*, 139 Wn. App. 743, 754, 162 P.3d 1153 (2007) (trial court properly required subcontractor to prove economic damages in suit seeking damages for breach of contract).

Montler contends that the damages were set by the appraisal, which was confirmed by Judge Veljacic, but we have rejected this argument above.

The trial court found First American breached the Policy by failing to submit to appraisal within 20 days of Montler's demand for appraisal, but that Montler suffered no damages because by the time of the appraisal she had already been paid the full benefit that she was entitled to under the Policy.  The trial court's conclusion of breach was erroneous.  With some exceptions that do not apply here, damages are a necessary element in a claim for breach of contract.

E.  ATTORNEY FEES UNDER OLYMPIC STEAMSHIP

Both parties assign error to the trial court's award of attorney fees to Montler in

the amount of $18,771.00.[6]  The trial court concluded that under *Olympic Steamship* a

party is entitled to attorney fees for prevailing on a breach of contract claim.  The court

reasoned that since Montler had proved her breach of contract claim, and since the court

had granted Montler's motion to compel appraisal and continue loss of use benefits,

Montler's motion was successful and she was entitled to the fees she incurred to pursue

the motion.  Otherwise, the court found that Montler was not the prevailing party for

purposes of costs under RCW 4.84.010.

*Olympic Steamship* held "that an award of fees is required in any legal action

where the insurer compels the insured to assume the burden of legal action, to obtain the

full benefit of his insurance contract, regardless of whether the insurer's duty to defend is

at issue."  117 Wn.2d at 53.  First American argues that the court should not have

awarded any fees because Montler was not compelled to assume the burden of legal

action to obtain the benefit of her insurance contract.  Instead, at the time Montler filed

her lawsuit and moved to compel appraisal, First American had already paid for the water

damage caused by the 2017 flood.  Since the trial court ultimately concluded that Montler

was not entitled to any benefit beyond what she had already received, she did not obtain a

---

[6] First American's second issue on appeal and Montler's third issue on cross-appeal.

benefit of the contract by compelling appraisal or continuing loss of use benefit on the mold damage. Montler, on the other hand, contends that the trial court did not award enough attorney fees. We agree with First American and hold that the trial court erred in holding that Montler was entitled to some fees under *Olympic Steamship* for having to file a motion to obtain the benefits of her insurance policy.

Washington generally follows the "American Rule" on attorney fees, providing that "fees are not recoverable by the prevailing party as costs of litigation unless the recovery is permitted by contract, statute, or some recognized ground of equity." *Leingang v. Pierce County Med. Bureau, Inc.*, 131 Wn.2d 133, 143, 930 P.2d 288 (1997). The holding in *Olympic Steamship*, recognized the power disparity between an insurer and an insured, and provided equitable authority for attorney fees when the insured must seek legal recourse to ensure coverage rather than simply the value of a claim. *Woo v. Fireman's Fund Ins. Co.*, 150 Wn. App. 158, 175-76, 208 P.3d 557 (2009); *see also Dayton v. Farmers Ins. Grp.*, 124 Wn.2d 277, 279-80, 876 P.2d 896 (1994) (fees not available under *Olympic S.S.* where dispute was merely to whether claim should be valued at $10,000 or $16,000 under UIM policy).

Montler contends that she prevailed on her claim to enforce an appraisal and continue loss of use benefits. While *Olympic Steamship* did not address whether an insured must prevail in order to obtain attorney fees, our Supreme Court recently denied fees to an insured because he prevailed on only one of his three claims. *New York Life*

*Ins. Co. v. Mitchell*, 1 Wn.3d 545, 528 P.3d 1269 (2023).  The question raised in this case is whether Montler prevailed for purposes of fees under *Olympic Steamship* when her interlocutory motion was granted but she failed to ultimately prove that the mold damage was covered by the policy.

The general rule in Washington is that the prevailing party is one who "'receives judgment in that party's favor.'"  *Sardam v. Morford*, 51 Wn. App. 908, 911, 756 P.2d 174 (1988) (quoting *Blair v. Washington State Univ.*, 108 Wn.2d 558, 571, 740 P.2d 1379 (1987)).  Under a different statute our Supreme Court has held that, "'A plaintiff "prevails" when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.'"  *Parmelee v. O'Neel*, 168 Wn.2d 515, 522, 229 P.3d 723 (2010), (quoting *Farrar v. Hobby*, 506 U.S. 103, 111-12, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992)).  While a party is considered "prevailing" when they obtain permanent injunctive relief, "victory in a preliminary injunction is not sufficient to make a plaintiff a prevailing party where that plaintiff eventually loses on the merits, as the victory is 'ephemeral' and the plaintiff has merely won the battle but lost the war."  *Id*. at 523.

Here, Montler did not prevail for purposes of attorney fees under *Olympic Steamship* because by the time she filed her motion, she had already received all of the benefits under the policy to which she was entitled.

37

Montler contends that she did prevail because the court required First American to continue paying loss of use benefits on a temporary basis. But *Olympic Steamship* provides equitable grounds for attorney fees when the insured obtains the full benefit of an insurance contract by pursuing legal action. 117 Wn.2d at 53. Here, even though the court ordered First American to continue paying loss of use benefits while the parties resolved their dispute, ultimately the court concluded that Montler was not entitled to those loss of use benefits.

While her interlocutory motion was successful, Montler failed to succeed at trial on her additional claim that the mold damage was caused by the 2017 flood. Ultimately, her lawsuit failed to obtain any additional benefit under the policy. In other words, she won the battle and lost the war. Because she did not prevail on her claim to extend coverage, Montler is not entitled to attorney fees under *Olympic Steamship*.

F. WHETHER THE TRIAL COURT ERRED IN NOT FINDING FIRST AMERICAN HAD PROVED ITS AFFIRMATIVE DEFENSES OF MISREPRESENTATION AND FRAUD

In its third issue on appeal, First American challenges the trial court's conclusion that First American failed to prove that Montler intentionally or materially misrepresented or concealed material information in her insurance claim for the 2017 flood. At trial, First American argued that Montler's attorney misrepresented that Kester had determined the cause of the mold in his report and also made misrepresentations to the court and First American's counsel that the *Yang* lawsuit was wholly separate and

38

unrelated to this lawsuit. The policy provided that in the event the insured intentionally conceals or misrepresents a material fact or engages in fraudulent conduct, the insurer can void the policy.

The trial court found that First American failed to prove these affirmative defenses. Otherwise, First American prevailed at trial except for the trial court's conclusion that it breached the policy by failing to participate in an appraisal and the award of attorney fees under *Olympic Steamship*, both of which we reverse above. First American does not identify any other right affected by the trial court's conclusion that it failed to prove fraud or misrepresentation. Because we grant First American relief on other grounds, and because First American does not claim it is otherwise aggrieved, we decline to address this issue.[7] *See* RAP 3.1

> G. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO IMPOSE CR 11 SANCTIONS AGAINST MONTLER

In its fourth issue on appeal, First American assigns error to the trial court's finding that Montler and her attorney did not violate CR 11.[8] In its motion, First American argued that Montler, her attorney, and her appraiser misrepresented Kester's

---

[7] First American does not claim that it will seek to recover overpayments made to Montler.

[8] In its motion for CR 11 sanctions, First American incorrectly quotes and cites to the federal rule, Fed. R. Civ. Proc. 11, which is similar, but not identical to the applicable state CR 11. *See* CP at 2421, and *Clare v. Telquist McMillen Clare PLLC*, 20 Wn. App. 2d 671, 683, 501 P.3d 167 (2021).

findings and report, misrepresented that the claims made in the Yang case were unrelated, and wrongfully withheld the settlement demand letter in the Yang case during discovery.

Under CR 11, an attorney or pro se party's signature on a pleading constitutes a certificate that the pleadings are well grounded in fact and warranted by law and are not being interposed for an improper purpose. 3A KARL B. TEGLAND, WASHINGTON PRACTICE: RULES PRACTICE CR 11 author's cmt. 2, at 230 (5th ed. 2006) (quoting *Bryant*, 119 Wn.2d 210). We review a trial court's decision on a request for CR 11 sanctions for abuse of discretion. *Clare v. Telquist McMillen Clare PLLC*, 20 Wn. App. 2d 671, 681, 501 P.3d 167 (2021). This deferential standard of review recognized that the trial court is in the best position to gage whether CR 11 was violated. *Id*.

At the hearing on First American's motion for CR 11 sanctions, the court noted that Montler's attorney had engaged in concerning conduct throughout the litigation, especially with respect to his representations as to what issues were before the court at trial. The court declined to impose CR 11 sanctions, but ultimately imposed CR 37 sanctions based on Montler's failure to provide discovery of the *Yang* settlement letter and associated documents. The court's order granting CR 37 sanctions noted that the 2018 *Yang* settlement letter and attachments called into question the sincerity of Vance's repeated arguments that the damages sought in this case were wholly separate from those sought in *Yang*. It also noted that while the representations did not amount to CR 11

violations, the use of the Blagg estimate and the Kester report in both cases demonstrate a "failure to show forthrightness and transparency in litigation." CP at 2709.

The trial court's decision on First American's motion for CR 11 sanctions was not an abuse of discretion. First American fails to demonstrate that CR 11 applies to the majority of the alleged misrepresentations it identifies. First American argues that Montler and her attorney violated CR 11 in several respects: though declarations and testimony, the oral arguments of her attorney, Montler's responses to discovery, a letter to the Yang's attorney, and a reply to Montler's motion to compel an appraisal wherein Montler's attorney asserts that the claims made in the *Yang* case were unrelated to the claims in this case.

CR 11(a) applies to "[e]very pleading, motion, and legal memorandum of a party represented by an attorney." A "legal memorandum" is generally recognized as a legal brief. *Clare*, 20 Wn. App. 2d at 682. A "pleading" is defined as "a complaint, answer, reply, and similar third-party complaints, answers, and replies." CR 7(a). Declarations are not pleadings or legal memorandum. *Clare,* 20 Wn. App. 2d at 682-83. Instead, declarations are signed under penalty of perjury and controlled in certain circumstances by CR 56(g). Discovery responses are governed by CR 26 and CR 37, not CR 11. *See Clipse v. State*, 61 Wn. App. 94, 97, 808 P.2d 777 (1991) (CR 11 does not apply to discovery disclosures). CR 11 sanctions are inappropriate "where other court rules more specifically apply." *Biggs v. Vail*, 124 Wn.2d 193, 197, 876 P.2d 448 (1994). First

41

American cites no authority for its position that CR 11 applies to oral arguments or letters to counsel.

The only alleged misrepresentation falling within the scope of CR 11 is Montler's reply brief in support of the motion to compel appraisal, which asserted that the *Yang* matter was "unrelated" to the claims Montler was making against First American. While somewhat disingenuous, the representation could be considered a legitimate trial strategy.

It is undisputed that Montler's home sustained mold and water damage. The common issue between the two lawsuits was the cause and extent of the mold damage and whether it occurred before or after Montler purchased the home. Given the potentially overlapping damages presented by these unconsolidated cases, it would be a reasonable litigation strategy under the circumstances to claim all damages in both cases to protect Montler's interest, or suggest the Yangs could be held liable for the mold-related damage to encourage settlement. As the court concluded, Vance certainly should have more forthcoming about the *Yang* matter and the settlement in that case, and his assertion that the matters were "unrelated" does not appear sincere in light of the 2018 *Yang* settlement letter. However, this was arguably a litigation tactic where Montler was taking the position in this case that all of the mold-related damage was caused by the October 2017 event. Moreover, at the time Vance filed this reply, Montler had settled the *Yang* lawsuit for $120,000, which ostensibly covered non-economic medical expenses and damages for 2015 repairs to the home. Accordingly, Montler was no longer seeking

damages in that matter and had purportedly not received any money for the property damage identified in the Kester report and Blagg appraisal.

Even if the trial court had found that Montler's reply brief violated CR 11, the court was within its discretion to decline sanctions. *Clare*, 20 Wn. App. 2d at 681-82. While an earlier version of the rule made sanctions mandatory once a violation was found, the rule was amended in 1993 to give courts considerable discretion in deciding whether to impose sanctions even if a violation is found. *Snohomish County v. Citybank*, 100 Wn. App. 35, 995 P.2d 119 (2000).

First American fails to establish that the trial court's conclusion that Montler and her attorney did not violate CR 11 was an abuse of discretion.

H.  WHETHER MONTLER IS ENTITLED TO HER ATTORNEY FEES ON APPEAL

Montler contends she is entitled to attorney fees on appeal under RAP 18.1 and *Olympic Steamship*.  RAP 18.1(a) authorizes a party to request attorney fees on appeal if "applicable law grants to a party the right to recover reasonable attorney fees or expenses on review."  As noted above, *Olympic Steamship* only authorizes an award of fees in an action where the insurer compels the insured to assume the burden of legal action to obtain the full benefit of his insurance contract, but only where the insured is the prevailing party.  Since Montler did not prevail on her claim that the policy covered the mold damage, we decline to award attorney fees on appeal.

No. 39497-2-III
*Montler v. Belfor USA Group, Inc., et al.*


We affirm the trial court's decisions on the issues raised by Montler. We likewise affirm on most of the issues raised by First American. We reverse the trial court on two issues: (1) the court's conclusion that First American breached the policy by refusing to name an appraiser, and (2) the court's award of attorney fees to Montler under *Olympic Steamship*. We remand for the trial court to modify its judgment according to this opinion.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Staab, J.

WE CONCUR:

_____
Pennell, J.

_____
Siddoway, J.P.T.[*]

---

[*] Judge Laurel H. Siddoway was a member of the Court of Appeals at the time argument was held on this matter. She is now serving as a judge pro tempore of the court pursuant to RCW 2.06.150

44